NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

LUCIA D., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, R.L., *Appellees*.

No. 1 CA-JV 19-0129
FILED 10-10-2019

Appeal from the Superior Court in Maricopa County
No. JD528581
The Honorable David King Udall, Judge

**AFFIRMED**

COUNSEL

Robert D. Rosanelli Attorney at Law, Phoenix
By Robert D. Rosanelli
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Thomas Jose
*Counsel for Appellee DCS*

---

**MEMORANDUM DECISION**

Judge Diane M. Johnsen delivered the decision of the Court, in which Presiding Judge Kenton D. Jones and Judge James B. Morse Jr. joined.

---

**J O H N S E N**, Judge:

**¶1** Lucia D. ("Mother") appeals the superior court's order terminating her parental rights to her son ("Child"), born in 2007. She argues that the Department of Child Safety ("DCS") failed to make diligent efforts in providing reunification services. For the following reasons, we affirm.

**FACTS AND PROCEDURAL BACKGROUND**

**¶2** In 2015, Mother suffered a traumatic brain injury that resulted in a prolonged hospital stay. Her injuries rendered her unable to care for Child and his two older siblings (both of whom now are older than 18). The children's father was being deported to Mexico and was unable to care for them. DCS filed a dependency petition against both parents. Child was temporarily placed in foster care, then later joined his siblings in the care of his maternal aunt and uncle.

**¶3** Initially, the superior court set the case plan as family reunification. Early on, the children enjoyed spending time with their mother. Later, however, the older siblings wanted to discontinue visiting Mother, and only Child would participate in supervised visits with her.

**¶4** Child eventually was placed with his father in Mexico and the dependency was dismissed. Unfortunately, however, the father was unable to care properly for Child and returned him to Arizona to live with Child's older sister. The older siblings' Guardian ad Litem then filed a new dependency action as to both Mother and the father. The Guardian ad Litem maintained that Mother was unable to parent Child due to mental illness and also alleged abandonment. The case plan was again family reunification.

**¶5** To facilitate reunification, DCS provided Mother with a variety of services, including a neuropsychological evaluation performed by Dr. Gustavo Franza, Psy.D. In a written report, Franza diagnosed Mother with recurrent depression, a "Major Neurocognitive Disorder" and

Acculturation Difficulty. He further noted that Mother's traumatic brain injury would exacerbate the symptoms of her disorders. He concluded that a child in Mother's care would be at "high risk" and that the possibility Mother would "be able to demonstrate minimally adequate parenting skills in the foreseeable future is poor at best." Regardless, Franza suggested that Mother might benefit from individual counseling, a referral to a neurologist, a Seriously Mentally Ill ("SMI") evaluation, and parenting classes.

¶6        At Mother's intake appointment for individual counseling, Dr. Rosanna Hanley, Ph.D., concluded that Mother's "severe cognitive [impairment]" prevented her from achieving "her treatment goals at this time." Hanley observed, "Client demonstrated a high level of serious cognitive deficits. These impairments need to be addressed and treated (if [p]ossible) before client will benefit from counseling." Accordingly, Hanley concluded individual counseling was not appropriate and recommended that, consistent with Franza's recommendation, Mother be referred for an SMI evaluation and to a neurologist for evaluation of her cognitive difficulties. Mother eventually received one-on-one sessions with Dr. Alberto Texidor, Ph.D. In his records of those sessions, Texidor expressed concerns about Mother's cognitive abilities and her minimal understanding of his role.

¶7        Meanwhile, Mother was provided with therapeutic visits with Child, overseen by Hanley. Initially, the visits went well, but after four sessions, Hanley expressed concerns about Mother's ability to parent Child appropriately. The situation worsened, and after another month, Child asked that the visits be discontinued. Hanley concluded that future visits were not in Child's best interests and cancelled further visitation.

¶8        Ultimately, the superior court changed the case plan from reunification to severance and adoption. DCS moved to terminate Mother's parental rights based on mental illness and/or mental deficiency, and the court held a two-day evidentiary hearing. Relying on the testimony of the DCS case worker, Texidor and Franza, the court found "significant evidence of Mother's mental illness and deficiency" that rendered her unable "to discharge normal parental responsibilities." It further found DCS had made reasonable efforts to reunify the family, but those efforts had been futile and "Mother was not capable of learning or improving in therapy." In light of those findings, and at the urging of Mother's Guardian ad Litem, the court found that DCS had satisfied its burden of proof and ordered Mother's parental rights severed. At the same time, the court also severed the rights of Child's father; that ruling is not at issue in this appeal.

**¶9** Mother timely appealed. We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution, Arizona Revised Statutes ("A.R.S.") section 8-235(A) (2019) and Arizona Rule of Procedure for the Juvenile Court 103(A).[1]

## DISCUSSION

**¶10** The superior court may terminate a parent's rights based on clear and convincing evidence that "the parent is unable to discharge parental responsibilities" because of "mental illness" or "mental deficiency." A.R.S. § 8-533(B)(2) (2019); *see Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22 (2005) (court must find clear and convincing evidence of at least one statutory ground). The court also must find by a preponderance of the evidence that termination is in the child's best interests. *Kent K.*, 210 Ariz. at 284, ¶ 22.

**¶11** On appeal, Mother challenges only the superior court's finding that DCS satisfied its obligation to provide her "with the time and opportunity to participate in programs designed to improve" her ability to care for Child. *See Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 37 (App. 1999).

**¶12** "Arizona courts have long required the State, in mental-illness-based severances, as in others, to demonstrate that it has made a reasonable effort to preserve the family." *Id.* at ¶ 33. DCS, however, is not obligated "to provide every conceivable service or to ensure that a parent participates in each service it offers." *Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, 235, ¶ 15 (App. 2011) (quoting *Maricopa County Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994)). Instead, DCS only must offer those services with a "reasonable prospect of success" – it need not "provide services that are futile." *Id.* (quoting *Mary Ellen C.*, 193 Ariz. at 192, ¶ 34). Because the superior court is in the best position to weigh the evidence, we view the evidence in the light most favorable to sustaining the ruling and do not reweigh the evidence. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009). We will affirm unless there is no reasonable evidence to support the termination order. *Id.*

**¶13** In support of her argument that DCS failed to provide her with reunification services, Mother contends DCS failed to refer her to a neurologist and for an SMI evaluation, both of which Franza recommended.

---

[1] Absent material revision after the relevant date, we cite the current version of a statute or rule.

The record reflects that, although DCS does not pay for medical services such as treatment for traumatic brain injury and for serious mental illness, DCS tried to help Mother find such services though community organizations for which she might qualify. In other words, DCS was unable to provide those services directly, but it made reasonable efforts to assist Mother in securing those treatments.

¶14 Moreover, even if Mother had seen a neurologist as recommended, the record supports the conclusion that a referral would have been futile. Franza recommended a neurological examination to determine the extent of Mother's traumatic brain injury and whether it would affect her ability to parent or impair her ability to successfully engage in mental-health therapy. Even without the referral to a neurologist or for SMI treatment, however, Mother's limits were clear. Texidor, who has worked with hundreds of patients with traumatic brain injuries, testified that, given Mother's dual challenges with mental illness and brain impairment, she had reached "maximum medical status" and was unlikely to see significant improvement. Further, Franza explained at the hearing that, as a result of Mother's cognitive impairment, "she presents with a lot of difficulty in her ability to remember information, retain it, and use it to solve problems; day-to-day problems, not only for herself, but when you add caring for a child, it gets more complicated." Indeed, Mother's cognitive impairment was so severe that Hanley, Mother's original referral for individual counseling, concluded counseling could not be productive, and Franza agreed with Texidor's conclusion that Mother had reached her limits.

¶15 For these reasons, the evidence supports the conclusion that a referral to a neurologist or provision of SMI services would have had no "reasonable prospect of" successfully reunifying Mother and Child. *See Christina G.*, 227 Ariz. at 235, ¶ 15 (quoting *Mary Ellen C.*, 193 Ariz. at 192, ¶ 34).

¶16 Finally, Mother argues that DCS did not provide her with individual counseling even though Franza had recommended it. Instead, she received parenting classes from Texidor, which she asserts were insufficient. On appeal, Mother cites Texidor's statements at the termination hearing that he was not providing individual counseling. But Franza testified that in his opinion, Texidor *was* providing individual counseling. Franza agreed that, regardless of the label attached to Texidor's sessions with Mother, those sessions satisfied what Franza had envisioned when he made his recommendations. As Franza and Texidor both made clear, moreover, further therapy would have been futile.

¶17 In any event, and sadly, reasonable evidence supports the superior court's determination that further efforts to provide reunification services would have been futile. *See Christina G.*, 227 Ariz. at 234-35, ¶¶ 13, 15. As in *Christina G.*, expert witnesses identified severe and persistent challenges to Mother's ability to properly parent and concluded that additional services would not enable her to do so without significant risk to a child. *See id.* at 235-36, ¶¶ 16-20.

## CONCLUSION

¶18 For the foregoing reasons, we affirm the superior court's termination order.



AMY M. WOOD • Clerk of the Court
FILED: AA